# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DARRELL CHOATES,** | : | |
| **Plaintiff** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | **No. 15-3755** |
| **AKER PHILADELPHIA SHIPYARD, et al.,** | : | |
| **Defendants** | : | |

**Goldberg, J.**                                                            **January 31, 2018**

## MEMORANDUM OPINION

Plaintiff Darrell Choates, individually and doing business as Choates General Contracting, Inc. ("CGC, Inc."), has sued Defendants Aker Philadelphia Shipyard, Inc., now known as Philly Shipyard, Inc. (together, "Shipyard") and Shipyard's contracts manager, Patrick Miller, for race discrimination pursuant to 42 U.S.C. § 1981. Plaintiff's allegations are centered around Defendants' declining to contract with CGC, Inc. for waste removal services at Shipyard's construction site in Philadelphia, Pennsylvania. Compl. ¶¶ 1-2, 28.

Defendants move for summary judgment urging that Plaintiff Choates lacks standing to assert a discrimination claim which can only be brought by CGC, Inc., the proposed contracting party. As to the merits of the claims presented, Defendants principally maintain that the record is devoid of evidence supporting a reasonable inference that they intentionally discriminated against CGC, Inc. or Choates based on his race. Defendants explain that they declined to contract with CGC, Inc. because the bid submitted by Choates for removal services was much higher than the cost of removal services supplied by Shipyard's vendor at the time, and current vendor today—Advanced Disposal Solutions, Inc. ("ADS, Inc.").

Choates opposes summary judgment for several reasons. He first responds that his standing is not problematic because he "filed this claim with himself and his company as plaintiff," averring "discrimination not just against himself personally, but against 'him and his company' and members of his team." Pl. Am. Resp. at 7 (citing Compl. ¶¶ 2, 3, 7). He requests permission to amend the pleading to correct "the apparent error in the caption of this matter."

As to the merits, Choates maintains that there are sufficient facts to establish that Defendants intentionally discriminated against him and his company because of his race. He explains that during his attempts to do business and contract with Shipyard, "he was lied to, demeaned, treated unfairly, and discouraged every step of the way" because of his race. Pl. Am. Resp. at 1, 3. Choates further states that the Shipyard declined the two proposals submitted by him as CEO for CGC, Inc., and instead chose to continue purchasing removal services from ADS, Inc.—which Choates asserts was owned by a white male, Kirk Dolaway. Id. at 4. Choates maintains that Defendants' stated reason for declining to contract—the overall pricing quoted for CGC, Inc.'s removal services—is a pretext for Defendants' racially discriminatory intent and actions. Id. at 4-6.

For the reasons that follow, Defendants' motion will be granted.

I.    **THE SUMMARY JUDGMENT RECORD**

Because I am granting summary judgment, ample time will be taken to review the facts of record. As set forth infra, these facts will be analyzed in the light most favorable to Plaintiff.

Plaintiff Darrell Choates is an African-American who is employed by Choates General Contracting, Inc., where he has worked for 20 years. CGC, Inc. performs "development, construction, recycling, building maintenance, water removal, general contracting/subcontracting work, project managing and construction management." Defs. & Pl. Resp. Statement of Facts

("SOF") ¶¶ 4, 5, 7; Defs. Mot., Ex. E, Deposition of Darrell K. Choates, dated Dec. 1, 2016, 7:19-23, 9:5-16.

Defendant Aker Philadelphia Shipyard, Inc., now known as Philly Shipyard, Inc., is a commercial shipyard. Defendant Patrick Miller presently is Shipyard's General Manager of Purchasing. From May of 2011, until November of 2014, Miller was the Contracts Manager responsible for Shipyard's contract for yard-wide trash, recycling, and sorting removal services. Defs. & Pl. Resp. SOF ¶¶ 1-3. As General Manager of Purchasing, Miller continued to oversee the removal services contract. Defs. Mot., Ex. D, Miller Statement, dated Nov. 2, 2015, ¶ 2.

Shipyard customarily procures and contracts for removal services using a form captioned, "Turnkey Workscope for Yard Wide Trash, Recycling, and Sorting Removal from APSI." Defs. Mot., Ex. G, Turnkey Workscope; Defs. & Pl. Resp. SOF ¶¶ 8-9 ("the scope of the work is fixed"); Defs. Mot., Ex. C, Deposition of Patrick G. Miller, dated Dec. 1, 2016, 24:11-18, 25:4-13. Miller described a "turnkey contract" as one "[w]here we don't manage the vendor at all, they're responsible for their management and supervision and the scope of work." Id., 18:4-12. Miller noted that the contract for removal services is "a major contract," and a change in vendors is "a major change in operations." Id., 28:25–29:5; Defs. & Pl. Resp. SOF ¶ 10.

On April 9, 2011, Shipyard solicited bids for removal services, requiring that bids be submitted within eight days by April 17, 2011. Defs. & Pl. Resp. SOF ¶ 11; Miller Dep., 73:10-14. Shipyard accepted the bid submitted by ADS, Inc., and ADS, Inc. has been the Shipyard's vendor for removal services since 2011 to the present. Id., 11:18-12:8, 77:10-12; Miller Statement, ¶ 3; Defs. & Pl. Resp. SOF ¶ 12.

Since the inception of operations on January 2, 2002, through at least August 1, 2013, ADS, Inc. was wholly owned by three Dolaway women—Suzanne E., Ann Elizabeth, and Susan

R. Miller Dep., 38:4–39:2; Defs. Mot., Exs. H, W, X, & Y; Defs. & Pl. Resp. SOF ¶¶ 13, 36-39.

The record contains no evidence that before or after August 1, 2013, the female ownership of

ADS, Inc. changed.

The record reflects that from December 21, 2010, through August 1, 2013, Kirk

Dolaway, a non-African-American male, was a manager of ADS, Inc. Defs. Mot., Ex. J,

Decennial Report of Association Continued Existence. Defs. Mot., Ex. I, Purchase Order signed

on June 13, 2011, by Mr. Dolaway as "Manager" of ADS, Inc.; Defs. & Pl. Resp. SOF ¶¶ 14-15.

Before December 21, 2010, and after August 1, 2013, the record is silent as to whether Kirk

Dolaway was a manager of ADS, Inc. The record contains no evidence that Kirk Dolaway was

an owner of ADS, Inc. at any time.

Apparently referring to the contract for removal services at issue here, Plaintiff's

complaint alleges that Shipyard "awarded a $15 million dollar minority bid opportunity and sole

source contract to a 'WHITE MALE.'" Compl. ¶ 2. It is also alleged that Shipyard awarded the

contract to a company that was a "'WHITE MALE OWNED ENTERPRISE' owned by Kirk

Dolaway, who certainly does not qualify as a 'WOMEN or MINORITY OWNED ENTERPRISE.'"

Id. ¶ 31. Choates testified that the referenced "white male" is Kirk Dolaway, who is the owner

of ADS, Inc. Choates Dep., 34:3–35:4. When asked at deposition whether he had any

documents evidencing Kirk Doloway's ownership interest in ADS, Inc., he stated: "It's online.

You can pull it up. . . . No, I don't have documents with me today." Id., 36:5-12, 34:3–36:12

(questioning the contention that Mr. Dolaway was an owner of ADS, Inc.). Choates's attorney

did not have any documents either. Id., 36:13-14. No evidence was produced by Choates or his

attorney, and none is proffered here, to support the contention that Kirk Dolaway is an owner of

ADS, Inc. See Pl. Resp. SOF ¶¶ 13, 39 (citing only Choates Dep., 34:18–35:25, which refers to the testimony noted immediately above).

Before July of 2013, Choates "contacted Aker's and the staff for maybe about five months to get involved [in] minority participation goals on Aker's Shipyard on their projects, on their building projects and recycling projects as well," and he "contacted management to explain to them [he] was reaching out for a contract opportunity." He "made several attempts," but "did not receive any phone call back," and "wasn't getting any feedback or response." Choates Dep., 23:14-24; Pl. Counter-Statement of Facts ("CSOF") ¶ 11.

In July of 2013, Choates telephoned and spoke with Sanjay Deshmuk, Shipyard's Vice President of Purchasing, who was Miller's direct supervisor. During the phone call, they discussed opportunities for CGC, Inc. to bid on Shipyard's scrap services. Choates Dep., 23:25–24:5; Pl. CSOF ¶ 12; Miller Dep., 43:25–44:13; Defs. Mot., Ex. K, Deposition of Sanjay Deshmuk, dated Dec. 2, 2016, 14:21–16:7.

On Friday, July 5, 2013, Deshmuk emailed Miller, asking him to have someone send a request for quotation ("RFQ") to Choates for "scrap." On Monday, July 8, 2013, Miller responded: "Is this someone special? We are not going out for Scrap pricing at this time. Are you doing this as a favor?" Later that afternoon, Deshmuk replied, "Correct Yes." Defs. Mot., Ex. L, email chain; Defs. & Pl. Resp. SOF ¶¶ 19-20.

During the summer of 2013, Shipyard was under contract with ADS, Inc. for removal services. Defs. & Pl. Resp. SOF ¶ 16. Miller attests that "Aker was satisfied with the services of Advanced Disposal and was not seeking to replace Advanced Disposal with another vendor during the summer of 2013." Miller Statement, ¶ 3. Miller testified that from "time to time," Shipyard would send out an RFQ, even though it was under contract with a particular vendor:

"So we're looking for better pricing or if service is not good with current providers, then we'll try to get a new vendor." Miller Dep., 30:8-23; Deshmuk Dep., 16:8-21, 21:11-23; Pl. CSOF ¶¶ 5-8. Shipyard and its vendors—"either party"— can terminate their contracts "at any time." Miller Dep., 31:7-13, 78:13-17; Pl. CSOF ¶ 9. <u>See</u> Defs. Mot., Ex. AA, Aker Philadelphia Shipyard, Inc. Terms and Conditions of Purchase ("Terms and Conditions"), § 13, "Suspension of Performance."

On Tuesday, July 9, 2013, Miller emailed Choates. In the email, Miller introduced himself as the Contracts Manager responsible for the Shipyard's removal services contract. A copy of the Turnkey Workscope for removal services was attached to the email. The email noted that Choates had ten days to submit his bid: "Due Date is Friday July 19, 2013." The email stated: "Please let me know if you need any further information to bid." Defs. Mot., Ex. M, email. Later that evening, Choates responded by email, thanking Miller and stating in part: "I would like to arrange a walk [through] ASAP and go over the details, pick up location of the RFQ." Defs. Mot., Ex. N, email; Defs. & Pl. Resp. SOF ¶¶ 21-22.

On early Wednesday morning, July 10, 2013, Miller emailed Choates asking if he was available to visit the shipyard the next morning, Thursday, July 11, 2013, at 8:00 a.m. Choates responded that he was available: "tomorrow is good around 8:00 and 9:00 I can B there. Thanks." Miller replied that another Shipyard employee, "Paul Krape will plan on meeting at our guard shack at 8:00 a.m.," and "Security will contact Paul when you arrive." Defs. Mot., Ex. N, email chain; Defs. & Pl. Resp. SOF ¶ 23.

Miller did not inform Choates that in order to walk through the shipyard, Choates needed to wear personal protection equipment ("PPE")—that is, a hard hat, safety glasses, safety boots, full-length pants, a full-length shirt, and "anything coming for a job site." Pl. CSOF ¶¶ 14-15;

Miller Dep., 52:3-17, 53:12-17.  Miller testified that instructions are not provided or needed because, "[t]he vendors usually know that they need to come in full PPE."  Id., 69:8-19.

On Thursday, July 11, 2013, Choates checked into the guard shack at 8:53 a.m.  Choates was accompanied by Tina Marie Russell of A.T. Russell Construction, Inc. and Ellen Mitchell of Disposal Corporation of America, who were members of Choates's "team."  Defs. Mot., Ex. O, sign-in sheet; Choates Dep., 24:22-24; Defs. & Pl. Resp. SOF ¶ 24.  Choates did not notify Shipyard that he was bringing team members with him, nor did he wear full PPE.  Miller Dep., 68:12-15.  Russell and Mitchell wore skirts and high heels, and Shipyard refused to permit them to "go out in the yard in those conditions," because "[t]hat would violate our health and safety policy for the yard."  Id., 53:18-23, 68:1-11.  Shipyard "made accommodations for [Choates] to go around in the truck so he could go see the yard layout."  Id., 53:25–54:3, 68:19-25.  Miller testified that because Choates did not wear PPE, the site visit was "short," and "we had to ride around in a truck instead of walk[ing] the yard."  Id., 51:18–52:2.

After the site visit, Choates and Miller exchanged emails on July 11, July 15, and July 16, 2013, regarding projected quantities of material to be removed and methods for pricing various items, among other topics.  Miller responded, providing the information sought by Choates and stating, "Let me know if you need further information."  See Defs. Mot., Ex. P. email chain; Defs. & Pl. Resp. SOF ¶¶ 25-28.

On Friday, July 19, 2013, Choates emailed a "Proposal" for removal services to Miller, which was captioned, "Choates General Contracting, Inc. . . . Local Certified Minority Firm Philadelphia Pa." and was signed by "Darrell Choates CEO" for CGC, Inc.  Miller received the Proposal.  Defs. Mot., Ex. Q ("First Proposal"); Defs. & Pl. Resp. SOF ¶ 29.

On Monday, July 22, 2013, Miller emailed Deshmuk and Krape, attaching a copy of the First Proposal and stating: "Choates is way more than we currently pay." Defs. Mot., Ex. R, email; Miller Statement, ¶ 10; Miller Dep., 12:18–15:13, 34:3–36:13 (comparing CGC, Inc.'s pricing with the pricing by ADS, Inc. and other vendors); Defs. & Pl. Resp. SOF ¶ 30.

On Monday, July 29, 2013, at 6:49 a.m., Miller emailed Choates, stating:

> Tha[nk] you for submitting your quote.
> We have reviewed your information and we will not be purs[u]ing
> further with Choates General Contracting.

Defs. Mot., Ex. T, email; Defs. & Pl. Resp. SOF ¶ 32. Later that morning on July 29, 2013, Miller received a phone call from Choates asking why he was not awarded a contract for removal services. Miller Statement, ¶ 12. Miller told Choates that "the prices he submitted were much higher than those of Aker's current vendor." Id.; see also Miller Dep., 37:25–38:3, 74:11-20 ("I believe I said his pricing is not even in the same ballpark so I can't even negotiate with him.").

Sometime after that phone call from Choates, Miller reviewed an email from Choates. Miller Statement, ¶ 13. Choates's email had been sent earlier on "Mon. 7/29/2013 2:00 a.m." and attached a revised "Proposal" for removal services, which again was dated July 19, 2013, captioned, "Choates General Contracting, Inc. . . . Local Certified Minority Firm Philadelphia Pa.," and signed by "Darrell Choates CEO" for CGC, Inc. Defs. Mot., Ex. U, email and "Second Proposal"; Defs. & Pl. Resp. SOF ¶ 33. The Second Proposal contained revised prices—lower roughly by half of what was first proposed. "The drastic and almost-immediate reduction in Mr. Choates['s] prices caused Aker concern." Miller Statement, ¶ 14. Cf. Defs. Mot., Exs. Q & U (Proposals); Defs. & Pl. Resp. SOF ¶ 34. When asked at deposition to explain why the Second Proposal caused concern, Miller testified:

> I find it very weird that a vendor, one, would initially give high pricing,
> and then be able to reduce it so fast. So either we were going to get taken

advantage of with high pricing originally or they didn't know what they
were doing.

Miller Dep., 36:14–37:8.

On Tuesday, July 30, 2013, Choates sent a lengthy email to Miller, stating among other

things: "I am very concern[ed] if there is a discrimination concern with my self or CGC . . . ."

Choates requested "reconsideration and a meeting." He also stated: "I would like to have in

writing the reason you are not considering Choates General Contracting INC for the RFQ bid."

Defs. Mot., Ex. V, email.; Defs. & Pl. Resp. SOF ¶ 35. On August 6, 2011, Miller on behalf of

Shipyard responded to Choates, stating:

> Aker Philadelphia Shipyard, Inc. has concluded its efforts to
> pursue an alternate vendor for removal services. We have decided
> to continue our contract with our current vendor. In keeping with
> Aker Philadelphia Shipyard's principles, the contractor is a women
> owned enterprise.
>
> We appreciate your interest in working with the shipyard, however
> your overall pricing is higher than our current pricing. As this
> RFQ process is now complete and you have submitted two
> proposals already, we do not feel an additional meeting is
> necessary.

Defs. Mot., Ex. Z, email; Defs. & Pl. Resp. SOF ¶ 40.

When asked at deposition why the contract for removal services was not awarded to

CGC, Inc., Miller testified: "We were currently under contract and the price that he submitted

was significantly higher than our current contract and we were happy with the service that we

had with our current provider." Miller Dep., 67:5-20; Defs. SOF ¶ 42. Deshmuk , who

participated in determining whether Shipyard would accept CGC, Inc.'s bid for removal services,

testified: "I saw that the prices were, you know, way higher than what we were then paying the

current vendor." Deshmuk Dep., 22:10-25; Defs. SOF ¶ 42.

Choates asserts that his efforts to do business and contract with Shipyard and Miller were a "humiliating and painstaking process." Compl. ¶ 25; Pl. Am. Resp. at 3. Choates testified:

> For a minority contractor and myself to go through the discriminating tactics that I went through with Aker's and the bid process of requesting documents, not receiving it, being requested to make adjustments and after the adjustment is made still get rejected, and to be lied to saying that the contract was given to another minority contractor. In fact, it wasn't.

Choates Dep., 48:22–49:12, 185:2-4. Choates asserts that the reason he was not awarded the contract for removal services was "because of his race, [he] was demeaned and belittled," as he so testified. Pl. SOF ¶ 42 (citing Choates Dep., 185:2-4).

The complaint alleges that "Plaintiff was belittled by Defendant, Patrick Miller and lambasted with derogatory and racially motivated comments and statements meant to hurt Plaintiff." Compl. ¶¶ 5, 18-20. Choates, when asked at deposition what derogatory and racially motivated statements were directed at him, testified: "I was told directly that I should not be bidding on these types of projects and my company is not qualified." When asked: "Anything else?," Choates testified: "And that aggressive tone and demeanor of each conversation that I had with Patrick." Choates Dep., 39:3-15; Pl. CSOF ¶16.[1]

Shipyard has a corporate policy preference for contracting with minority and women-owned suppliers which states: it "will use good faith efforts to arrange for such suppliers to be engaged as suppliers of products and/or services insofar as they are competitive with respect to quality, services, delivery time and price." Shipyard's Terms and Conditions, § 34, "Supplier

---

[1] See also Compl. ¶ 19 ("Miller asked Plaintiff in a derogatory manner 'why would a company like yours (African American Company) want to do business with Aker, don't you think you are a little out of your league.'"); Choates Dep., 25:15-19 (asserting that "Patrick said that why Choates is bidding on a project like this, that we don't belong bidding on this type of project."); id., 44:5-8 (asserting that Miller said: "That I and my company do not belong bidding on these type of projects.").

Preferences."[2]  See also Deshmuk Dep., 9:20–10:4, 24:6-23, 24:24–25:12; Pl. CSOF ¶ 1.  No other special consideration is given to minority or women-owned vendors.  Defs. & Pl. Resp. SOF ¶ 44-45.

Shipyard does not have any self-imposed or governmentally-prescribed minimum procurement requirements for minority and women-owned businesses.  Deshmuk Dep., 26:12-25, 29:19-25; Miller Dep., 71:2-13; Defs. & Pl. Resp. SOF ¶ 43.  Although women-owned suppliers are preferred, Shipyard does not have any procedures for verifying that companies are in fact owned by women.  And Shipyard does not have any procedures for including minority and women-owned suppliers.  Pl. CSOF ¶¶ 2-4; Deshmuk Dep., 10:20–11:16, 12:18–13:25; Miller Dep., 42:7-15.  Miller considered ADS, Inc. to be a women-owned business because he was told as much by Kirk Dolaway in 2011, before Shipyard signed the contract for removal services with ADS, Inc.  Id., 38:4-21; Pl. CSOF ¶ 10.

## II.   LEGAL STANDARD

Summary judgment is appropriate only if "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Cunningham v. M & T Bank Corp., 814 F.3d 156, 160 (3d Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).  To determine whether a movant has met this standard, "the court must view the facts 'in the light most favorable to the non-moving party.'"  NAACP v. N. Hudson Reg'l Fire & Rescue, 665 F.3d 464, 475 (3d Cir. 2011) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).  The "court 'may not weigh the evidence or assess credibility.'"  Goldenstein v. Repossessors Inc., 815 F.3d 142, 146 (3d Cir. 2016) (quoting MBIA Ins. Corp. v. Royal Indem. Co., 426 F.3d 204, 209 (3d Cir. 2005)).

---

[2]  "Minority-owned (MBE) and women-owned (WBE) business enterprises are preferred suppliers to Akers Philadelphia Shipyard, Inc. (APSI).  [The Shipyard] will use good faith efforts to arrange for such suppliers to be engaged as suppliers of products and/or services insofar as they are competitive with respect to quality, services, delivery time and price."  Defs. Mot., Ex. AA, Aker Philadelphia Shipyard, Inc. Terms and Conditions of Purchase, § 34, "Supplier Preferences."

"A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" <u>Cunningham</u>, 814 F.3d at 160 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). "To be material, a fact must have the potential to alter the outcome of the case." <u>N. Hudson</u>, 665 F.3d at 475 (citing <u>Kaucher v. Cnty. of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006)). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. <u>Id.</u>

"After the movant shows that there is no genuine issue for trial, the non-moving party then bears the burden of identifying evidence that creates a genuine dispute regarding material facts." <u>N. Hudson</u>, 665 F.3d at 475 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). Entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322-23. In that case, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> (quoting Fed. R. Civ. P. 56); <u>J.F. Feeser, Inc. v. Serv–A–Portion, Inc.</u>, 909 F.2d 1524, 1531 (3d Cir. 1990). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted). The non-moving party "must do more than simply show that there is some metaphysical doubts as to the material facts." <u>Id.</u>

## III.    <u>DISCUSSION</u>

Discrimination on the basis of race in the making and enforcing of contracts is prohibited. 42 U.S.C. § 1981.[3] Section 1981 "protects the equal right of '[a]ll persons within the jurisdiction

---

[3] The statute provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the

of the United States' to 'make and enforce contracts' without respect to race." Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 474 (2006) (quoting § 1981(a)).

Section 1981 defines "to make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). "Consistent with that language, the Supreme Court has held that 'Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship.'" Gross v. R.T. Reynolds, Inc., 487 F. App'x 711, 717-18 (3d Cir. 2012) (quoting Domino's Pizza, 546 U.S. at 476). "Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights." Domino's Pizza, 546 U.S. at 476. Although "a corporation may have 'standing to assert a § 1981 claim,' . . . 'a president or sole shareholder may not step into the shoes of the corporation and assert that claim personally.'" Id. at 474, 476, 479-80 (affirming McDonald v. Domino's Pizza, LLC, No. So2-0311LRH(PAL), 2002 WL 34099814, at *2 (D. Nev. Aug.21, 2002)). In other words, § 1981 plaintiffs "must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's." Id. at 479-80.

### A. Choates Does Not Have Standing Under § 1981

In his opposition to the summary judgment motion, Choates correctly asserts that the pleading avers "discrimination not just against himself personally, but against 'him and his company' and members of his team." Pl. Am. Resp. at 7 (citing Compl. ¶¶ 2, 3, 7). But Darrell

---

full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

Choates is the sole plaintiff pled: "Darrell Choates, individually and d.b.a. Choates General Contracting, Inc., Plaintiff." Compl. at 1. Darrell Choates and Choates General Contracting, Inc. are not one and the same person or business enterprise. It is undisputed that CGC, Inc. is a separate, incorporated business entity. However, the pleading does not identify CGC, Inc. as one of the parties. [4] The pleading also does not identify any injuries to CGC, Inc. arising from Shipyard's declination to contract with CGC, Inc. Instead, the pleading alleges that Defendants blocked efforts by CGC, Inc.'s CEO, Choates, to form a contractual relationship between Shipyard and a non-party, CGC, Inc. Nor does the pleading sue for damages to compensate CGC, Inc., demanding instead: "compensatory damages suffered because of the racial discrimination Plaintiff has had to endure." Id. at 3, 9.

Importantly, the pleading does not allege that Choates personally has or would have any rights under the proposed contractual relationship between Shipyard and CGC, Inc. It is undisputed that Choates submitted two Proposals to Shipyard, one on July 19, 2013, and the other on July 29, 2013, in his capacity as an employee and officer of CGC, Inc. It is also undisputed that the proposed agreement was one solely by CGC, Inc. to supply removal services to Shipyard. In short, the proposed contract rights were to be between Shipyard and CGC, Inc., and not Choates.

---

[4] Here, the caption of the pleading suggests that Darrell Choates, an individual, and Choates General Contracting, Inc., are one and the same person or a single business entity. The caption uses "d.b.a." as an abbreviation for "doing business as." The abbreviation "is commonly understood to alert interested parties to the fact that the person or entity so designated, is known for business purposes under another or fictitious name." Hazer v. Zabala, 26 A.3d 1166, 1169-70 (Pa. Super. Ct. 2011). "D/B/A/ identifies an equivalency or single identity between the appellations." Id. See Black's Law Dictionary (10th ed. 2014) (Westlaw 2014) (The abbreviation "d/b/a" "signals that the business may be licensed or incorporated under a different name."). "But it is fundamental corporation and agency law—indeed, it can be said to be the whole purpose of corporation and agency law—that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts." Domino's Pizza, 546 U.S. at 477. "Choates General Contracting, Inc." is not a fictitious name; instead, it is the name of a separate, incorporated business entity.

Given the above, Choates, individually, lacks standing to pursue the present claim under § 1981. Domino's Pizza, 546 U.S. at 476, 479-80. The outcome would be the same even if Choates were liberally considered to be an independent contractor operating under the trade name, "Choates General Contracting, Inc." An "'independent contractor may bring a cause of action under section 1981 for discrimination occurring within the scope of the independent contractor relationship.'" Faush v. Tuesday Morning, Inc., 808 F.3d 208, 220 (3d Cir. 2015). But here, Choates does not have any rights as an independent contractor under the proposed contract for removal services that he could seek "to make and enforce." 42 U.S.C. § 1981(a).

Choates requests leave to amend the pleading to name CGC, Inc. as plaintiff. Pl. Am. Resp. at 7. Federal Rule of Civil Procedure 15 governs amendments to pleadings. "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Such leave should be granted in the absence of undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously permitted, undue prejudice to the opposing party, and futility of the amendment. Foman v. Davis, 371 U.S. 178, 182 (1962); Jang, M.D. v. Boston Sci. Scimed, Inc., 729 F.3d 357, 367-68 (3d Cir. 2013).

Theoretically, a curative amendment adding CGC, Inc. as the plaintiff might avoid summary judgment based on Choates's lack of standing under § 1981. See Fed. R. Civ. P. 15(a)(2); Fed. R. Civ. P. 17(a)(1), (a)(3). See, e.g., Marks Law Offices, LLC v. Mireskandari, 704 F. App'x 171, 174-75 (3d Cir. 2017) (affirming substitution where the failure to name the real plaintiff in interest was "not the result of any bad faith," but rather "looseness and sloppiness" for which the litigating plaintiff should not have to forfeit his lawsuit); Alvin v. Suzuki, 227 F.3d 107, 121-22 (3d Cir. 2000) (permitting amendment to clarify the basis of a

corporation's claim that it was independently harmed and to add another company as a plaintiff). However, the curative amendment requested here would not result in an actionable claim under § 1981 on the merits. As set forth below, sufficient facts have not been proffered to support a reasonable inference that Defendants discriminated against either CGC, Inc. or Choates based on his race.

### B. Choates Has Not Established a Prima Facie Case of Racial Discrimination

Racial discrimination claims under § 1981 are considered under the framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a failure to hire case brought under Title VII. Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999); Manning v. Temple Univ., 157 F. App'x 509, 513 (3d Cir. 2005). See also Carvalho–Grevious v. Del. State Univ., 851 F.3d 249, 256-57 (3d Cir. 2017) (ruling that the "'substantive elements of a [racial discrimination] claim under § 1981 are generally identical to the elements of an employment discrimination claim under Title VII'") (alteration in original) (quoting Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009)).

McDonnell Douglas requires a plaintiff to first prove by a preponderance of the evidence a prima facie case of discrimination. Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); McDonnell Douglas, 411 U.S. at 802; Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 n.4 (3d Cir. 1999). The "plaintiff must generally present prima facie evidence that 'raises an inference of discrimination.'" Manning, 157 F. App'x at 513 (quoting Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (citation omitted)). "A prima facie case under McDonnell Douglas raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on consideration of impermissible factors." Pivirotto, 191 F.3d at 352 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). By establishing a prima facie case, the plaintiff "creates a rebuttable 'presumption that

the [defendant] unlawfully discriminated against' him." <u>U.S. Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 714 (1983) (quoting <u>Burdine</u>, 450 U.S. at 254).

Under <u>McDonnell Douglas</u> as modified for purposes of § 1981, a plaintiff may establish a prima facie case of racial discrimination in the making or enforcing of a contract by showing: "'(1) [he] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts. . . .'" <u>Gross</u>, 487 F. App'x at 716 (quoting <u>Brown v. Philip Morris, Inc.</u>, 250 F.3d 789, 797 (3d Cir. 2001)) (citations and internal quotation marks omitted) (alterations in original).

Here, there is no dispute that Choates is a member of a racial minority and that the challenged conduct by Shipyard and Miller during the bidding process was activity protected by § 1981. Whether the record supports a reasonable inference that Defendants intentionally discriminated against CGC, Inc. or Choates based on his race is contested. Choates has the initial burden to produce evidence sufficient to create an inference that Shipyard's decision to decline to contract with CGC, Inc. was more likely than not based on an illegal discriminatory criterion. <u>See</u> <u>Pivirotto</u>, 191 F.3d at 356 (ruling that <u>McDonnell Douglas</u> "clearly require[s] only 'evidence adequate to create an inference that [a decision to decline to contract] was based on an illegal discriminatory criterion'") (quoting <u>O'Connor v. Consol. Coin Caterers Corp.</u>, 517 U.S. 308, 312 (1996) (citation, internal quotation marks, alterations, and emphasis omitted)) (alteration added). On the record before me, Choates fails to raise the required inference.

Choates points to several events during the bidding process which in his view demonstrate that Defendants discriminated against CGC, Inc. and him based on his race. He claims that during the four or five months before July of 2013, he contacted Shipyard seeking

opportunities to supply services, but received no response. He points out that he was told directly that he should not be bidding on these types of projects and his company was unqualified. He notes that Miller did not instruct him to wear PPE before he and his team arrived at the shipyard for the scheduled walk-through, which prevented him from adequately surveying the site. He claims that he was humiliated by the process and singled out for this treatment because of his race, and concludes that "[t]hese actions were all intentional and taken together with [his] minority status, evidence intentional discrimination sufficient to establish a prima face case." Pl. Am. Resp. at 3.

None of the cited events directly evidence racial discrimination. "Direct evidence" is evidence sufficient to allow the jury to find that the "decisionmakers placed substantial negative reliance on an illegitimate criterion [race] in reaching their decision." Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) (alteration in original). Accord Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002); Lei Ke v. Drexel Univ., No. 11-6708, 2015 U.S. Dist. LEXIS 118211, at *37 (E.D. Pa. Sept. 4, 2015). "Such evidence is overt or explicit evidence which directly reflects discriminatory bias by a decision maker." Id.

Moreover, none of the cited events permits a reasonable inference of racial discrimination. Choates states in conclusory fashion that the reason for these unfortunate and disappointing events is that Shipyard and Miller had discriminatory animus toward CGC, Inc. and him. But no facts are proffered to support that conclusion. Choates does not show how the cited events were in any way related to his race, or how Shipyard and Miller treated non-minority service suppliers any differently than him. Merely reciting that race was the reason does not make it so.

Moreover, the assertion that Choates made unsuccessful efforts to make a contract with Shipyard before July, 2013, is unsupported. At deposition, Choates was unable to identify whom he called or the phone numbers he called. The record contains no facts showing that Shipyard ever rebuffed or rejected his efforts to bid. "The non-movant 'may not rest upon mere allegations, general denials, or . . . vague statements.'" Port Auth. of N.Y. & N.J., 311 F.3d 226, 233 (3d Cir. 2002) (alteration in original) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). "At summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000) (citing Celotex, 477 U.S. at 324).

Choates cites one statement and Miller's conversational tone of voice as evidence of unlawful intent to discriminate: "I was told directly that I should not be bidding on these types of projects and my company is not qualified." "And that aggressive tone and demeanor of each conversation that I had with Patrick." Choates Dep., 39:3-15. Choates concludes that these words and acts show racial animus toward CGC, Inc. and him. But again, Choates proffers no facts to support that conclusion. No racial sentiments or overtones are cited and this statement is entirely consistent with lawful discrimination based on legitimate business considerations. Even broadly considering these words and Miller's tone in the context of the whole record, there are no facts from which a jury could conclude that Defendants really meant that Choates and his team were unqualified because of their race.

Choates also cites to the undisputed fact that Miller did not tell him to wear PPE in order to walk through the shipyard, and then asserts that the omission was racially motivated. But once again, Choates has not identified any facts of record which would support a reasonable

inference that Miller was silent for unlawful reasons. The undisputed record reflects that Miller mistakenly assumed that Choates knew that full PPE was required, just like the other outside vendors with whom Miller was familiar. Choates does not offer any evidence to the contrary.

Finally, Choates claims that he "was humiliated by the process and singled out for such treatment because of his race." Pl. Am. Resp. at 3. Choates's personal feelings and subjective assumptions and beliefs are not facts. Duncan v. Chester Cnty. Hosp., No. 14-1305, 2016 WL 1237795, at * 2 n.3 (E.D. Pa. Mar. 29, 2016), aff'd, 677 F. App'x 58 (3d Cir. 2017). "Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010). That Choates was humiliated by "the process" and "singled out for such treatment" are also too vague and unspecific to defeat summary judgment. See, e.g., King v. City of Philadelphia, 66 F. App'x 300, 305 (3d Cir. 2003) (ruling that the plaintiff's allegation "that he was singled out for suspension because of his race is too unspecific to give rise to a reasonable inference" of racial discrimination).

If a plaintiff does not make a prima facie showing of illegitimate discrimination, "the defendant is entitled to judgment as a matter of law." Pivirotto, 191 F.3d at 352 n.4. Choates has not made out an element of a prima facie case on which he bears the burden of proof—that is, intentional discrimination based on race. Accordingly, on this ground alone, Shipyard and Miller are entitled to summary judgment. Celotex, 477 U.S. at 322-23.

## C. Shipyard Articulates Legitimate, Nondiscriminatory Reasons for Declining to Contract with CGC, Inc., Which Reasons Are Not Pretexts

Even assuming Choates had established a prima facie case of racial discrimination, summary judgment would still be appropriate. Shipyard pointed to legitimate, nondiscriminatory reasons for the decision not to contract with CGC, Inc.: The First Proposal was much higher

than the cost of removal services supplied by Shipyard's vendor at the time, ADS, Inc., and Shipyard was happy with the services of ADS, Inc. Miller found the Second Proposal's sudden reduction in pricing unrealistic and indicative of a lack of competence. Choates argues that these reasons were not Defendants' true reasons, but were a pretext for unlawful discrimination. This argument is not supported with record evidence.

Under McDonnell Douglas, if a plaintiff succeeds in proving a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the plaintiff's rejection. Aikens, 460 U.S. at 714; Burdine, 450 U.S. at 253-55 & n.8; McDonnell Douglas, 411 U.S. at 802. That is, "the defendant must 'produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate nondiscriminatory reason.'" Aikens, 460 U.S. at 714 (alteration in original) (quoting Burdine, 450 U.S. at 254). If the defendant meets this burden, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253 (citing McDonnell Douglas, 411 U.S. at 804). In order to avoid summary judgment, a plaintiff must "put forward 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" Kautz v. Met–Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (citation and internal quotation marks omitted; emphasis in original)) (alteration added).

In an effort to show that a reasonable factfinder could find Defendants' nondiscriminatory reasons "unworthy of credence," Choates first disputes that ADS, Inc. was a wholly women-owned business. He asserts that ADS, Inc. was owned by a white male, Kirk

Dolaway.  In Choates's view, this is the true reason for Defendants' declining to contract with CGC, Inc.  But Choates does not identify any facts establishing that Mr. Dolaway ever had an ownership interest in ADS, Inc.  In fact, the record supports just the opposite—that ADS, Inc. was at all pertinent times wholly owned by three women.

Choates also asserts that CGC, Inc. was not the only bidder seeking to supply removal services to Shipyard, and that Shipyard was actively considering other bidders.  Choates does not explain the significance of this argument; however, it again suggests that CGC, Inc. was rejected, or some other bidders were preferred, because Choates is an African–American.  Again, no facts are identified to support these assertions.  The record shows only that Shipyard generally was and is "always looking for better deals by suppliers, by service."  Deshmuk Dep., 21:22-23.

In addition, the record establishes that during the bidding process, Choates was treated the same as previous bidders.  In April of 2011, Shipyard required ADS, Inc. and other bidders to submit bids within eight days.  In July of 2013, Choates was given more than eight days to submit his bid.  Miller Dep., 73:6-17.  When Choates and his team arrived without wearing full PPE to survey the shipyard, Shipyard accommodated Choates and drove him around the site in a truck.  Miller considered CGC, Inc.'s Proposals even though they were not submitted on Shipyard's preferred form, the Turnkey Workscope.  Miller promptly responded in detail to Choates's questions about Shipyard's pricing methods.  Shipyard's representatives promptly responded to Choates's phone calls and emails.

Choates also argues that Shipyard's general, corporate-policy preference for minority-owned and women-owned businesses evidences Shipyard's true reasons for declining to contract with CGC, Inc.  Why this is asserted is not clear.  Shipyard's corporate policy requires its employees to make good faith efforts to engage minority- and women-owned businesses insofar

as they are competitive with respect to quality, services, delivery time and price. However, Shipyard does not have any self-imposed or governmentally-prescribed minimum procurement requirements. The decision to continue the contract with ADS, Inc., a women-owned business, was in accord with Shipyard's policy preference. Choates cites, without further explanation, the undisputed facts that Shipyard does not have any procedures for verifying that companies are in fact owned by women, or for including minority- and women-owned suppliers. But Shipyard had no legal obligation to adopt such procedures.

Finally, as evidence of pretext, Choates cites Miller's and Deshmuk's testimony that the overall pricing proposed by CGC, Inc. was significantly higher than the pricing of Shipyard's vendor at the time, ADS, Inc., contending that their testimony is conclusory. However, Miller testified that he reached that decision by comparing the prices quoted by CGC, Inc. with those by ADS, Inc. Miller Dep., 12:18–15:13, 34:3–36:13. In addition, Choates disputes that CGC, Inc.'s pricing was in fact higher than ADS, Inc.'s pricing. Pl. SOF ¶ 42; Pl. Am. Resp. at 6. Choates asserts that documents produced in discovery reveal that "ADS, Inc.'s pricing . . . is not less than Plaintiff's bid." Id. Choates also asserts that those documents do not delineate any pricing categories that closely correspond or can be compared to CGC, Inc.'s pricing categories. Choates concludes that a triable dispute exists because: "It is clearly disputed that ADS, Inc.'s pricing was comparable to Plaintiff's bid." Id. But Choates does not submit those documents or any other evidence to support these bare assertions. This too is not a genuine dispute. Importantly, "pretext is not shown by evidence that 'the [defendant]'s decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the [defendant], not whether the [defendant] is wise, shrewd, prudent or competent." Kautz, 412 F.3d at 467 (quoting Fuentes, 32 F.3d at 765) (alterations added). It is immaterial whether Miller

erred or used the best method to reach his decision that CGC, Inc.'s prices were "not even in the same ballpark" as ADS, Inc.'s prices.  Miller Dep., 37:25–38:3, 74:11-20.  Choates has not proffered any evidence to establish that Miller, Deshmuk, or anyone else at Shipyard was motivated by racial animus in evaluating and declining CGC, Inc.'s Proposals.

IV.     **<u>CONCLUSION</u>**

Plaintiff Choates has not met his burden to show a § 1981 prima facie case of racial discrimination.  Defendants Shipyard and Miller have met their burden to establish legitimate, nondiscriminatory reasons for the decision not to contract with CGC, Inc.  Choates has not presented any evidence contradicting the facts put forward by Defendants as the reasons for that decision.  Defendants are entitled to summary judgment and their motion will be granted.

An Order accompanies this Memorandum Opinion.